# RUDOLPH WALTHER, Respondent, v. CITY OF CAPE GIRARDEAU et al., Appellants.

St. Louis Court of Appeals. Argued and Submitted June 5, 1912. Opinion Filed July 2, 1912.

1. **WATERS AND WATERCOURSES: Surface Water: "Dominant Estate" Defined.** A "dominant estate" is property which is situated above or higher than that of a lower, or subservient, estate.

2. ———: ———: **Dominant Estate: Judicial Protection: Municipal Corporations.** While a private owner of a dominant estate is entitled to judicial protection of his land from illegal acts of the owner of the subservient estate in stopping the flowage of water, a city or other public body, not the owner of a dominant estate, has no right to judicial protection of a claim to the flowage of water, not constituting a public or navigable stream.

3. **WATER AND WATERCOURSES: What Constitutes "Watercourse."** A drain across a lot did not constitute a "watercourse," in a legal sense, where all the water that passed through it was surface water or was led to it through a sewer drain.

4. ———: **Surface Water: Common Law Rule.** The common law rule, that surface water, being a common enemy, every one has a right to protect himself against its flow over or upon his land, prevails in this state.

5. **MUNICIPAL CORPORATIONS: Nuisances: Manner of Abatement.** While municipalities may declare what constitutes a nuisance and may summarily abate the same, such abatement must be done in a lawful manner, and is subject to determination by the courts, both as to the fact of nuisance and as to the manner in which the abatement is carried out; and the power to abate does not carry with it the power to destroy, unless the thing abated be a nuisance *per se* and of a public character.

6. ———: ———: ———. If a nuisance on private property can be abated in any other way than by forcibly taking possession of the property, it is the duty of a city, undertaking to abate the nuisance, to do so.

7. **INJUNCTIONS: Mandatory Injunction: Municipal Corporations: Compelling Undoing of Illegal Acts.** A mandatory injunction lies to compel a city to restore a lot to its former con-

dition, after having improperly taken forcible possession of the same and constructed a sewer drain through it, over the owner's protest and in the face of notice that proceedings would be taken as promptly as possible to enjoin such action.

8. ———: ———: ———: ———: Adequate Remedy at Law. Where a city wrongfully constructed a drain across plaintiff's lot, over his protest and in the face of notice that proceedings would be taken as soon as possible to enjoin such construction, his right to a mandatory injunction to compel restoration of the lot to its former condition could not be defeated on the theory that he had an adequate remedy in an action for damages.

9. MUNICIPAL CORPORATIONS: Trespass of Agents: Individual Liability. The agents of a municipal corporation who, without authority of law, enter upon land and lay a drain over it, commit a trespass and lay themselves liable to the owner for damages, compensatory and penal.

10. ———: Nuisances: Manner of Abatement: Sewers: Eminent Domain. A municipal corporation has no right to summarily take possession of a strip of land for the purpose of constructing a drain across it and thereby abate a nuisance located on other land; but it has the power to obtain land by condemnation, for the construction of sewers.

11. ———: ———: Right to Abate: Question of Fact. The question as to the right of a city to abate a thing claimed to be a nuisance is one of law and not of fact.

12. EQUITY: Jury: Trial by Jury. In an equity case, it is optional with the trial court to take the opinion of a jury on a question of fact.

13. INJUNCTIONS: Mandatory Injunction: Municipal Corporations: Compelling Undoing of Illegal Act: Right of Trial by Jury. While, in an action at law, an issue as to the existence of a nuisance is properly submitted to a jury as one of fact, it was not improper, in a proceeding for a mandatory injunction to compel a city to restore a lot to the condition in which it was before the city took forcible possession of it and constructed a drain across it, to refuse to submit to a jury issues as to whether plaintiff was liable for the maintenance of a nuisance and whether defendant had a right to abate it as it undertook to do.

14. MUNICIPAL CORPORATIONS: Abating Nuisance: Wrongful Act: Reimbursement for Expenses. A city is not entitled to recover against a property owner the cost of constructing a drain across his lot, where, in taking possession of the lot and in constructing the drain, it committed a trespass.

15. **APPELLATE PRACTICE:** Mandatory Injunction: Expiration of Time for Performing Act Pending Appeal: Form of Decree. In an action for a mandatory injunction, where a decree was rendered for plaintiff, and the time for doing the thing that defendant was required by the decree to do expired while the case was pending on appeal, the appellate court, on affirming the judgment, will remand the case to the trial court with directions to re-enter the decree and therein require defendant to do the things required to be done by him within a certain time thereafter.

Appeal from Cape Girardeau Court of Common Pleas. —*Hon. R. G. Ranney*, Judge.

AFFIRMED AND REMANDED (*with directions*).

*Frank Kelly* and *Ely, Kelso & Miller* for individual appellants; *Lane & Alexander* for the appellant city.

(1) Cape Girardeu is a city of the third class. The city not only has the right to abate nuisances within the city but it is its duty to do so. It is one of the police powers of the city, and may be exercised in a summary manner. Secs. 9231, 9235, 9574, R. S. 1909; McQuillian Municipal Ordinances, sec. 444; 29 Cyc. pp. 1214-1218; Chillicothe v. Bryan, 103 Mo. App. 409; Waggoner v. South Gorin, 88 Mo. App. 25; Gallaso v. Sikeston, 124 Mo. App. 380; Realty Co. v. Crockett, 158 Mo. App. 573, 138 S. W. 924; St. Louis v. Schmekelberg, 7 Mo. App. 556. Section 339 of the ordinance declared the pond a nuisance, and section 351 of the ordinance provided for the abatement thereof, and the notice was given and plaintiff ignored it, and the marshal had the right to abate it. Realty Co. v. Crockett, supra. (2) The plaintiff had no right to stop up the drain and cause a pond to be formed on the adjacent lots to the injury of the owners and to the damages and injury of the public. Goettenetroeter v. Kappleman, 83 Mo. App. 290; Paddock v. Somes, 102 Mo. 226. (3) The court erred in refusing to call a jury to pass upon the question of the pond being a nuisance and the right of the city to abate it. Cooley's Blackstone, pp. 219, 220;

Manufacturing Co. v. Milling Co., 79 Mo. App. 153; Grossman v. Oakland, 36 L. R. A. 593; Waggoner v. South Gorin, 88 Mo. App. 25; Lipscomb v. Little John-b0 S. E. 1023. (4) The plaintiff has an adequate remedy at law in an action for damages and a bill in equity will not lie. Burgess v. Kattleman, 41 Mo. 480; Weigel v. Walsh, 45 Mo. 560; Graden v. Parkville, 114 Mo. App. 527; Gordon v. Mansfield, 84 Mo. App. 367; Crenshaw v. Cook, 65 Mo. App. 264; Strother v. Cooperage Co., 116 Mo. App. 518. (5) An injunction will not lie for past injuries, or when the act complained of is complete. Owen v. Ford, 49 Mo. 436; Carlin v. Wolf, 154 Mo. 539; Davis v. Hartwig, 195 Mo. 398; Brier v. Bank, 225 Mo. 683; 22 Cyc. 759. (6) He who comes into equity must come with clean hands. Equity would have compelled plaintiff to put in a drain or restrained him from holding the water in a pond and creating a nuisance, therefore it will not restrain defendant from doing the very thing which it would require him to do himself. Heitz v. St. Louis, 110 Mo. 626; Little v. Cunningham, 116 Mo. App. 545; 16 Cyc. 144. Plaintiff maintaining a public nuisance cannot have the aid of equity to restrain defendant from abating it, although defendant has no authority to abate it. Railroad v. Crothersville, 159 Ind. 330, 64 N. E. 914; Eaton on Equity, sec. 20, page 69. (7) Equity will not grant a mandatory injunction unless the consequent damages cannot be estimated or compensated. Bank v. Kennett Est., 101 Mo. App. 389; Sec. 2534, R. S. 1909. (8) Plaintiff's bill should have been dismissed and defendant awarded judgment for the sum of ninety dollars and thirty-four cents for the cost of the work. Hannibal v. Richards, 82 Mo. 330; Sec. 9574, R. S. 1909.

*Wilson & Cramer* for respondent.

(1) The depression in the block in which plaintiff's property is situated is not a watercourse in the well defined legal meaning of that term, but simply

a natural drain for surface water. Scott v. Railroad, 158 Mo. App. 625. (2) Under the common law rule, which prevails in this state, that surface water is a common enemy, plaintiff had the right to protect himself against the water flowing through the depression in his lot by filling it up, even though the effect was to hold the water on his neighbor's land. Grant v. Railroad, 149 Mo. App. 306. Having this legal right, he was not answerable in damages to the adjoining owner, nor amenable to the provisions of the city ordinances for creating a nuisance. The pond if it was a nuisance, was not on plaintiff's premises, and he was under no obligation to leave an outlet for the water when improving his lot. (3) The evidence shows that the city discharges water collected in Themis and other streets into the depression west of Sprigg street through a sewer extending under Themis street for some distance into the alley, and that this water runs through the opening under Sprigg street onto the lots west of plaintiff's premises. No obligation rested upon the plaintiff to furnish the city a passage for the surface water it thus collected and threw upon those lots. The alleged nuisance could easily have been abated by closing the city's sewers, or filling up the lots west of plaintiff without invading his constitutional rights. (4) The sewer built across plaintiff's premises is a permanent structure of large-sized pipe, connected with cement, and the act of the city amounts to a high-handed taking of his property in violation of section 21 of the bill of rights which provides: ''That private property shall not be taken or damaged for public use without just compensation.'' (5) The sewer is a continuing nuisance which interferes with plaintiff's free use of his property and should be abated at the cost of the city. It would be unjust to require plaintiff to undo at his own expense what it took ten men three days to do in putting down the sewer. Plaintiff was entitled to a mandatory injunc-

tion to compel the city to remove the sewer and restore his lot to its former condition. Wood on Nuisances, sec. 786; Atterbury v. West, 139 Mo. App. 180; Bank v. Kennett, 101 Mo. App. 370.

REYNOLDS, P. J.—In March, 1910, the city of Cape Girardeau, a city of the third class, cut a ditch ninety feet in length, width not given, but apparently about three feet, through and across a lot owned by plaintiff fronting on Frederick street in that city and constructed a permanent sewer therein partly of twenty-four inch and partly of eighteen inch pipe, connecting the same with a thirty inch sewer pipe which the city had before then laid under Frederick street when it filled up that street. The city had no permission or authority from plaintiff to cut through his lot and lay this pipe but claimed the right to do so under its authority to abate a nuisance. The nuisance complained of is claimed to have been created by plaintiff filling his lot up to the grade of Frederick street and thereby stopping the flow of water from low ground to the west of his premises and from the lands of others through plaintiff's lot and thence into the sewer pipe which had been laid by the city under Frederick street. Preliminary to cutting the ditch through plainti's property and laying the sewer pipe in it, the city caused a notice to be served upon the plaintiff that the stopping and filling of the drain and sewer pipe on Frederick street by him, adjacent to and in front of his lot had caused the water to accumulate in the "ditch, drain, depression and watercourse" above where plaintiff had stopped and filled the sewer pipe and drain and had caused water to stand in that place to a depth of three or four feet, covering an area of about 1000 square yards, forming a pond of "stagnant, filthy, obnoxious water and giving rise to obnoxious and offensive and disagreeable odors, and is now, and will grow worse as the weather gets warmer, a public nuisance, endangering the public health,

and is a source of disease, to the great danger, damage, injury and annoyance of the public.'' Plaintiff was therefore notified that acting under the order of the acting mayor and in accordance with the provisions of the ordinance of the city, he was notified by the chief of police to open the drain and sewer pipe closed by him or cause it to be opened within twenty-four hours of the service of this notice or to signify his willingness that the city officers might enter on his premises and make the proper opening and drain to remove the water and so abate the nuisance. Plaintiff was further notified that if he failed or refused to comply with the demand and request the chief of police would take the necessary steps to drain the pond or pool and abate the nuisance by making an opening through plaintiff's lot and laying a drain pipe to connect with the one closed by him. This notice was served on the plaintiff on the 23rd of March. It appears by the testimony that on receipt of this notice plaintiff told some one of the officers of the city that he wanted a little time to consult his attorney about the matter and he thereupon telephoned to his attorney, who resided at Jackson in Cape Girardeau county, who told him that he would come down and examine into the matter in a day or two. At the expiration of the twenty-four hours, however, plaintiff not having taken steps to remove the obstruction by cutting a ditch through his premises and not having signified his willingness or given permission to the city to do so, the officers of the city, over the protest of plaintiff, entered upon his lot on Friday, the 25th of March, preliminary to doing the work of cutting the ditch through his premises. On Saturday, the 26th, plaintiff caused a notice to be served upon the mayor of the city that on Monday, at 2 o'clock p. m., he would present his application to the judge of the Cape Girardeau Court of Common Pleas in chambers, asking for a restraining order against the city. Without paying

attention to this notice, the officers of the city on that Saturday, the 26th, commenced cutting the ditch clear across plaintiff's lot, a ditch some seven feet in depth at Frederick street and a foot or so deep at its western end, and with a force of from seven, eight or nine men, possibly more, kept up the work all during Saturday and until late Saturday night and all through Sunday until late that night and on Monday morning completed the work by laying the sewer pipe through the whole width of plaintiff's lot, cementing its joints and then filling up the trench. The petition for the writ was filed with the court named on the 26th, but the work having then been finished, the cause went over to the November, 1910, term of the court. At that term defendants answered, the city in its separate answer justifying on the ground that the filling up of the lot by plaintiff in the manner filled by him was a nuisance in that it obstructed the flow of the water from the low ground to the west of him, it being set up in the answer that there was a natural watercourse and that the water in this pond or low land west of plaintiff was formed in part from springs and in part from waters falling from the heavens as also in part from water which flowed into it from a drain under the fill of the street next west of Frederick street. The individual defendants answered separately with general denials, two of the defendants however also pleading that while they were members of the city council at the time the alleged acts were committed, their terms had since expired and they were no longer officers of the city. On the hearing of the cause the court entered up an order sustaining plaintiff's petition and ordered the city to remove the sewer pipe and fill up the ditch on or before the 10th of February, 1911, and thereafter refrain from entering upon the lot of plaintiff and digging any ditch or trench or constructing any sewer pipe through it. From this defendants, filing their motion for a new trial and saving exceptions

to that being overruled, have duly perfected their appeal to this court.

It is argued by the learned counsel for appellants that plaintiff had no right to stop up the drain and cause a pond to be formed on the adjacent lots to the injury of the owners and to the damage and injury of the public. They introduced much testimony in an endeavor to prove that the pond spoken of was formed in part by springs and that a ravine, which they claimed was a natural watercourse, led from that through the property of plaintiff and into the sewer under and across Frederick street and claimed that plaintiff, as the owner of the subservient or lower lot, had no right to interfere with the natural flow of the water.

It is entirely unnecessary to consider this phase of the case. While the private owners of what is referred to by the courts and text-writers as the dominant estate, that is property situated above or higher than that of the lower or subservient estate, have an undoubted right to apply to the courts for the protection of their land from what may be claimed to be illegal acts of the owner of the subservient estate in stopping the flowage of water, we know of no case and have been cited to none where a city or other public body, not the owner of the dominant estate, has any right to appeal to the courts for the protection of any claim to the flowage of water, that water not being a public or navigable stream. This is so whether the doctrine of the civil law or of the common law is to be applied. In our state, as was definitely determined in Abbott v. Kansas City, St. J. & C. B. R. Co., 83 Mo. 271, the common law rule as to the stoppage of surface water prevails.

Before dismissing this phase of the case from consideration, it is not out of place to remark that the overwhelmning weight of the testimony establishes the fact that there has never been a watercourse, in

the legal meaning of that term, through the property of plaintiff. All the water which it is claimed that he prevented flowing through his lot was surface water, water falling either from the clouds or led into the pond through a sewer pipe that the city had itself laid into this low ground and under the street and an alley to the west of it. There is no substantial evidence that natural springs supplied the water. It was not a watercourse through plaintiff's property. [Gray v. Schriber, 58 Mo. App. 173, l. c. 178, and cases there cited.] Hence this water was surface water, and applying the doctrine of the common law, surface water being a common enemy, every owner has a right to protect himself against its flow over or upon his land. It cannot be said that when he does this that his act is either unlawful or that he is responsible for the effect of preventing the overflow on his land of this surface water. [Jones v. Wabash, St. L. & Pac. Ry. Co., 18 Mo. App. 251, l. c. 257, approved Webb v. Carter, 121 Mo. App. 147, l. c. 153, 98 S. W. 776.]

The nuisance complained of is not on the land of this plaintiff but it is on private property of adjoining owners. If it could be held that because the owner of the lower estate, in protecting his own property against surface water, is liable in damages as for a nuisance because of the stoppage of the flow of surface water over his property, then the whole doctrine upon which the right of stoppage of surface water is based would be overthrown.

In illustration of the law as applicable to the right of stoppage of surface water, it is sufficient to refer to Abbott v. Kansas City, St. J. & C. B. R. Co., supra, and cases there cited and those which have followed that case in our state. Referring to decisions of other jurisdictions the matter will be found very fully and ably treated in Hoyt v. City of Hudson, 27 Wis. 656; O'Connor v. Fond du Lac, Amboy & Peoria Ry. Co., 52 Wis. 526; Gibbs v. Williams, 25 Kan. 214.

See also 1 Wood on Nuisances (3 Ed.), pp. 494, 517, sections 378, 385.

But it is urged that the power of the city to declare a nuisance and the right to abate it by summary process is granted by statute as well as provided for by ordinance; that the courts cannot interfere. While it is true that the municipalities of this state have a right to declare what constitutes a nuisance and to abate nuisances even in a summary manner, it does not follow that in doing this they are above the law; they must abate a nuisance in a lawful manner, and always subject to determination by the courts, both as to the fact of nuisance and as to the manner of abatement. The power to abate does not carry with it the power to destroy (Waggoner v. City of South Gorin, 88 Mo. App. 25, 1. c. 34, and authorities there cited), unless it be a nuisance *per se* and of a public character. [Sullivan Realty & Improvement Co. v. Crockett, 158 Mo. App. 573, 138 S. W. 924.]

Judge DILLON announces as the law, that when the governing body of a municipality has conferred upon it the power to do an act, the power conferred in general terms without any prescribed mode of exercising it, that it necessarily has to a greater or less extent a discretion as to the manner in which the power shall be used, which cannot be judicially interfered with, but that this discretion is subject to judicial control when the power is exceeded "or there is a manifest invasion of private rights." [I Dillon on Corporations (5 Ed.), sec. 242.] "So," says Judge DILLON, ibid., sec. 243, "where it is made the duty of the city to remove, as far as they may be able, every nuisance which may endanger health, the courts, unless the power be transcended, cannot ordinarily interfere to control the manner in which this shall be done. But the power to abate nuisances, like all other municipal powers, must be reasonably exercised; and although the power be given to be exercised in any man-

ner the corporate authorities may deem expedient, it is not an unlimited power, and such means only are intended as are reasonably necessary for the public good; wanton or unnecessary injury to private property and private rights are not thereby authorized.''

In the case at bar the city authorities, without giving plaintiff any chance to be heard, proceeded to condemn the fill, which plaintiff had lawfully made on his own land, as a nuisance, although the water which was the real nuisance was on the land of another; and without having instituted and maintained any condemnation proceedings whatever for the taking of the plaintiff's property for the location of a sewer through his lots, and without his permission but in spite of his protest, entered upon his land by force and with a high hand, as the law construes the acts here done by these defendants, and committed a trespass upon his property. They did this with such expedition and with such force that before plaintiff had an opportunity to have the courts act, the acts of cutting the ditch, laying the pipe and filling up the excavation were completed. We are not to be understood as holding that there may not be extreme cases in which it is the right and duty of the municipal authorities to act promptly and in a summary manner. But this was not such a case. There was no necessity for haste and it is not clear that the city could not have abated the nuisance which the presence of the pond created, that nuisance, as the evidence shows, largely created by the inflow of water from the sewer under the street to the west of plaintiff's property. If the city could have abated the nuisance of the pond in other ways than forcibly taking possession of plaintiff's lot, it was its duty to do so. [Waggoner v. City of South Gorin, supra; Babcock v. City of Buffalo, 56 N. Y. 268.]

The right of the court to interfere here by mandatory injunction is challenged, the acts having been

completed before the court could hear and determine upon them.

The right of the courts to issue mandatory injunctions has been recognized by our courts in many cases. We had occasion recently to pass on this matter ourselves and to cite some of the cases in which that right had been recognized. [See Compton Hill Improvement Co. v. Strauch, 162 Mo. App. 76, 141 S. W. 1159.] We had in St. Louis Safe Deposit & Savings Bank v. Kennett's Estate, 101 Mo. App. 370, 74 S. W. 474, a case in which a mandatory injunction was issued by the trial court and its action fully sustained by our court, an example of a completed structure ordered to be removed after its completion. In that case Judge Goode, who wrote the opinion, has gone into the authorities so fully, that to undertake to discuss this branch of the case would be a work of supererogation.

In Planet Property & Financial Co. v. St. Louis, O. H. & C. Ry. Co., 115 Mo. 613, 22 S. W. 616, a mandatory injunction was sought to undo the acts of the railroad company in digging a cut through certain property and to restore the road through which the cut was made to its former condition. The injunction was refused solely on the ground that plaintiff had failed to aver in its petition that it had objected and notified the defendant of its objection while the road was being built.

In the case at bar there was not only no acquiescence or consent but there was determined and positive objection, followed by an appeal to the court, of which appeal defendant was duly notified before it had completed the acts sought to be enjoined.

Treating of interlocutory injunctions, Mr. High says (4 Ed., vol. 1, p. 10, sec. 5a), that since the object of a preliminary injunction is to preserve the *status quo,* the court will not grant such an order where its effect would be to change the *status* and that by the

"*status quo*" which will be preserved by preliminary injunction "is meant the last actual, peaceable, non-contested condition which preceded the pending controversy, and equity will not permit a wrongdoer to shelter himself behind a suddenly. and secretly changed *status,* although he succeeded in making the change before the hand of the chancellor has actually reached him. And where, before the granting of the injunction, the defendant has .thus changed the condition of things, the court may not only restrain further action by him, but may also, by preliminary mandatory injunction, compel him to restore the subject-matter of the suit to its former condition." It is true that the author is here treating of a preliminary order of injunction, but we know of no reason why the same rule should not apply to an injunction on final hearing.

Applying it to the facts in the case at bar, it appears that this plaintiff, in a peaceable and orderly manner, and in a lawful effort to protect his rights, denied that he was responsible for the maintenance of the alleged nuisance, and notified the city authorities not to enter upon his lot for the purpose of digging it up and laying the proposed sewer through it. Having reason to believe that in the face of this notice the city authorities proposed to go on with their threatened trespass on Saturday, plaintiff caused written notice to be served upon the proper officer of the defendant municipality, that on the following Monday he would apply to the judge of a court having jurisdiction in the premises for a temporary injunction restraining them from commencing the threatened work and on final hearing for an injunction perpetually enjoining them from entering on' his premises and carrying out the work. Upon the receipt of this notice the municipality, that municipality itself a creature of the law and its officers the servants of the people, charged above all others with the execution

and proper observance of the law, on the very day of the service of this notice, with a high hand and by force, says the law, designating such acts *vi et armis,* these officers entered upon the premises of plaintiff, put a large body of men at work digging a trench ninety feet long and some three feet or more wide through the whole length of the lot of this plaintiff, in direct violation of the law of the land which prohibited the doing of any but necessary work on the Sabbath day, continued this work on through that day and through the forenoon of Monday, so that when at the hour designated on Monday, that is to say 2 o'clock, the petition in this case was presented to the honorable judge of the court of common pleas, the work of digging the ditch, laying the sewer pipe in it and through the whole length of plaintiff's lot, and filling up the ground, was completed. Having completed the trespass these defendants now say: "You cannot make us undo what we have done—sue us at law for damages." If individuals, or municipalities, by such high·handed proceedings, tending to a breach of the peace, and in flagrant disrespect of the courts and in an attempt to thwart their jurisdiction, can, in this manner, evade the power of the chancellor and put the process of law and the orderly proceedings of the court at defiance in an attempt to. render any action the court may take abortive, we have a government of force and not of law. Much more is this course to be deprecated and condemned·when the instigators, promoters and executors of it are themselves officers of the law and representatives of one of the most important municipalities of the state.

We therefore hold that it was within the power of the trial court to issue the mandatory injunction in this case compelling the undoing of what had been done, especially so when in all good conscience and by the usual course of procedure that court had been ap-

166 Mo. App.—31

pealed to to exercise its chancery powers in the premises.

In an endeavor to drive the plaintiff from the court in this case, defendants not only assert that the action came too late and that the powers of a court of chancery, through a mandatory injunction, cannot be invoked to undo what they had done, but they claim that plaintiff has an adequate remedy at law in an action for damages.

Mr. High, in his standard work on Injunctions (4 Ed., vol. 1, p. 686, sec. 722b), says that an examination of the later authorities upon the subject of injunctions against trespass "discloses a decided tendency to adopt the adequacy or inadequacy of the legal remedy as the sole and ultimate test as to the right to equitable relief in such cases, and it will be seen that the question of irreparable injury is of importance only in so far as it bears upon this fundamental question of the legal remedy. While courts have, perhaps, never in express terms laid this down as the sole criterion, it will be seen that injunctive relief is freely granted regardless of the irreparable character of the injury inflicted, where it appears for any reason that full and complete redress may not be had in a court of law. Such considerations as those of a multiplicity of suits, the continuing nature of the trespass, the insolvency of the defendant, numerous acts where the damages for a single one would be insignificant, and the difficulty of proving or measuring the damages, all of which concern the remedy and not the wrong, and all of which have come to be of such controlling force, show beyond question that it is not so much the nature or kind of the wrong complained of as it is the relative efficiency of the legal as compared with the equitable remedy, which furnishes the fundamental, governing rule by which courts of equity are guided in administering preventive relief against the commission of a trespass."

In line with this we have the authority of Judge
DILLON, where, in chapter 31, sections 1570, 1572,
supra, he says that while courts of equity do not, as
a rule, interfere to prevent municipal authorities from
transcending or making a wrongful use of their pow-
ers, they will, in a proper case relieve against their un-
lawful or wrongful acts. "But," says Judge DILLON,
section 1573, "since municipal corporations are in-
vested with large powers to enable them to execute
specific objects, or to promote the welfare of the peo-
ple who are subjected to their rule; and since expe-
rience shows how frequently their officers abuse or
transcend their rightful authority to the detriment or
injury of the inhabitants, and how necessary it is that
the latter should have easy and effectual remedies to
restrain or correct municipal excesses of power; and
perhaps because in the code states the ancient line of
separation between law and equity is not so distinctly
maintained as formerly, the general tendency of the
later cases is to favor a relaxation rather than a strict
application of the rule . . . which denies the right
to resort to equity if there exists an adequate remedy
at law."

Applying these rules to the facts here, it is not
clear that plaintiff has a certain and adequate remedy
at law. Furthermore, it is apparent that the presence
of this sewer pipe in plaintiff's lot is a continuing
damage and nuisance. Plaintiff testified that this
sewer in his lot would forever prevent him from im-
proving the lot by the erection of a building upon
it; that any building erected would have this sewer
running through it in such a manner as to seriously
interfere with the erection of a building. That seems
to be clear, for while at the front of the lot the trench
is some seven feet deep and the twenty-four inch sewer
pipe is laid on the bottom of it at that point, as the
trench and the pipe run to the west of the lot, the
pipe is brought nearer the surface; for it appears

that the trench grows more shallow toward the west and the pipe is brought out at the west end of the lot but a few inches below the surface of the lot. In other words, the fill in front necessary to bring the lot up to the level of the street is much more than in the rear. It is true that damage on the basis that plaintiff is entirely deprived of the use of this strip through his lot might be estimated, so possibly could its decrease in value by its being split through or divided by the presence of this sewer. But it can hardly be said that these damages are an adequate compensation to a man, when the whole purpose and object of his acquisition of property is to improve it by the construction of a building. That object is practically annulled. In such a case, an action for damages might be sustained for the trespass, but we cannot say that it affords an adequate remedy. The presence of this sewer invites recurrent trespass. If its presence is recognized in and through plaintiff's property as lawful, the city authorities, almost from necessity, must have access to it to make repairs in case of any stoppage of the flow of water through it, or of any break in the sewer pipe.

Mr. High, supra, section 698, says that the rule of denying relief in equity has been relaxed in strong cases of irreparable injury as where the trespass will result in the destruction of the substance or chief value of the estate. In such cases the legal remedy would be entirely inadequate to afford redress and equity will restrain the trespasses, basing the relief in such cases upon the utter inadequacy of the remedy at law.

Here the act complained of, the trespass, was committed under and by authority of the city and by its officers. A serious question would surely arise, in an action against the city for damages, as to whether the city, the principal defendant in this case, could be held liable in damages for the unlawful acts of its

Walther v. Cape Girardeau.

agents. While it is true that the agents of the corporation, committing an act *ultra vires* the corporation, that act a trespass, would be individually liable in an action at law for damages occasioned by their act, even for punitive damages, it is a question which we do not now decide but which we hold at least doubtful, as to whether the municipal corporation itself could be held liable.

The act of the city in this case was a naked trespass, committed not only without sanction of law, but in violation both of the mandates of the Constitution and of statutory enactments. In a way the facts here are as in Commonwealth v. Pittsburg & Connellsville Railroad Co., 24 Pa. St. 159. There the defendant, a railroad corporation, was partially filling up one of the locks at the outlet of the Pennsylvania state canal at Pittsburg and casting an arch over it in such a manner as to entirely obstruct the use of it. The Commonwealth prayed for an injunction to prevent this. The defendant admitted that it was doing these acts in the construction of its road and urged as an excuse that the portion of the canal had never been of any valuable use to the state and that for many years it had lain in utter abandonment and desolation. Such, it is stated, seemed to be the fact. Mr. Justice LOWRIE, delivering the opinion of the court, commences in this vigorous language: "The boldness of this act seems almost like a studied test of the vigilance of the canal commissioners, and of the efficiency of the remedies which the state has provided for the prevention of injuries. It is hoped that the equity remedy, being somewhat unusual and peremptory in its character, will not be applied to an act which does so little real injury." Disposing of this hope by the citation of a number of cases in which, even by common law writs, the strong arm of the law has intervened between the law-breaker and the citizen, Judge LOWRIE holds the acts of the character present justify

the use of the exercise of the powers of a court of
chancery through injunction, that being conducive to
social order as furnishing an equivalent judicial rem-
edy. It is to be noted that this decision was ren-
dered in the year 1855, and before injunction as a pre-
ventive remedy had come into the common uses to
which modern circumstances and conditions have
given rise. Continuing, Judge LOWRIE says: "The
argument that there is no 'irreparable damage,' would
not be so often used by wrong-doers, if they would
take the trouble to observe that the word 'irrepara-
ble' is a very unhappily chosen one, used in express-
ing the rules that the injunction may issue to prevent
wrongs of a repeated and continuing character, or
which occasion damages which are estimable only by
conjecture and not by any accurate standard. . . .
As this argument is generally presented, it seems to
be supposed that injunctions can apply only to very
great injuries; and it would follow that he who has
not much property to be injured, cannot have this pro-
tection for the little he has. Besides this, where the
right invaded is secured by statute or by contract,
there is generally no question of the amount of dam-
age, but simply of the right. He who grants a right
cannot take it away, even on giving a better, without
a new agreement for the purpose. . . . And when
railway companies or individuals exceed their statu-
tory powers in dealing with other people's property,
no question of damage is raised when an injunction is
applied for; but simply one of the invasion of a right.
. . . And railway companies will not be allowed to
exercise their discretion capriciously; with the im-
mense powers that are freely and loosely given to
them, this much restraint is essential to the protec-
tion of private rights. . . . If they step one inch
beyond their chartered privileges to the prejudice of
others or of the stockholders, or offer to do any act
without the prescribed preliminary steps, they are lia-

ble to be enjoined irrespective of the amount of damage. They shall not take soil or land without payment or security: . . . and the dissent of one out of many tenants in common of land or easement will stay their hand until compensation be made. . . . Damage or no damage to others, they must obey their charter, and that was our decision in the late case of Manderson v. Commercial Bank (28 Pa. St. 379). . . . In the light of these principles the question before us is very easily decided. The matter complained of is an invasion of a public highway, and it must be enjoined against."

We have quoted from this case at some length because the principle it illustrates is applicable to the facts in the case at bar. It is true that that case presented one where the rights of the public were involved as against a railway corporation, itself a quasi public corporation, engaged in a public work, but the limitations upon the charters of railroads are no more stringent than the limitations in our state by statute upon the rights and privileges of municipal corporations. When they go outside of those rights, their acts are void and their agents committing them are trespassers. Nor are the rights of the individual less within the protection of the law than are those of the state. We feel safe, following this decision of the Supreme Court of Pennsylvania, in holding that when this municipal corporation went beyond its charter privileges to the prejudice of plaintiff and undertook to take possession of his property without the preliminary steps prescribed by our Constitution and statutes, it and its co-defendants are liable to be enjoined from further trespass and a court of equity has power to cause them to undo what they have illegally done, irrespective of the amount of damage.

In the case referred to above, the statute of the state of Pennsylvania was cited on the proposition that railway corporations shall not take soil or land

without payment or security. In our state that mat-
ter is controlled, not merely by statute but by manda-
tory constitutional provisions. Thus our Bill of Rights,
section 21, article 2, of our Constitution, in un-
mistakable terms forbids the taking or damaging of
private property for public use without just compen-
sation. That section further provides: ''Such com-
pensation shall be ascertained by a jury or board of
commissioners of not less than three freeholders, in
such manner as may be prescribed by law and until
the same shall be paid to the owner, or into court for
the owner, the property shall not be disturbed or the
proprietary rights of the owner therein divested.''
Construing this section of our Constitution, and the
statutes carrying it into effect, our Supreme Court
has said in many cases that when this right of emi-
nent domain is exercised, it must be exercised within
and confined to the letter of the statute conferring
the power. [See Thurston v. City of St. Joseph, 51
Mo. 510; Southwest Missouri Light Co. v. Scheurich,
174 Mo. 235, 73 S. W. 496; Clemens v. Connecticut
Mut. Life Ins. Co., 184 Mo. 46, 82 S. W. 1.] As be-
fore said, while treating of the abatement of a nui-
sance, the power to abate nuisances is conferred on
the municipalities of this state, but there is no im-
plied right to exercise that power in an unlawful man-
ner. This municipal corporation has the undoubted
right to declare a nuisance and to abate it. But its
act in declaring a thing a nuisance is subject to re-
view by the courts. [Waggoner v. City of South
Gorin, supra; Babcock v. City of Buffalo, supra.] It
has no right, as we have seen, in the abatement of a
nuisance on the property of one to enter upon the
land of another and take possession of a long strip
through the land of that other even for the purpose
of abating a nuisance, especially when that nuisance
is not on the lands of that other. The right of the
municipality to condemn the land of this plaintiff for

the construction of a sewer is undoubted, but the mode and manner of doing this and the guarantees thrown around the landowner when it is done, are provided by our statutes as well as by our Constitution. None of the forms required by statute were here observed. The rights guaranteed by the Constitution were entirely disregarded. If we are to remit this plaintiff here to his action for damages, even conceding that damage adequate to the injury could be awarded, we would, by indirection, sanction these unwarranted acts.

Learned counsel for appellants argue that the trial court erred "in refusing to call a jury to pass upon the question of the pond being a nuisance and the right of the city to abate it." There are two propositions here. That which asserts that the right of the city to abate the alleged nuisance is a jury question, is incorrect. That is a question of law. There are two answers to the first proposition: First, this was a proceeding in equity and it is optional with the trial court to take the opinion of a jury on a question of fact; second, it is true that when the issue is nuisance or no nuisance, it is proper, in an action at law, to submit that as one of fact to the jury. But that is not the issue here, even if we concede that the pond was a nuisance. The questions here involved are, is plaintiff liable for its maintenance, and had defendants the right to abate it, as they undertook to do, by entering upon the land of plaintiff in the manner here done.

It is argued that the petition of plaintiff should have been dismissed and judgment awarded defendant city for the cost of laying the sewer. In the view we take of the case it is obvious that the city cannot recover for this work. It was not only a volunteer in doing it, but a trespasser. This is not a case wherein the cost of public improvements can be assessed against the property of those benefited, nor is it one

falling within the ordinances of the city, for as we hold, the work was not done in a lawful manner.

There is some evidence warranting the trial judge in finding that all the individuals, as officers of the city, assented to the acts done. We will not disturb his finding on that.

The judgment of the circuit court granting the injunction and making it mandatory is affirmed. Inasmuch, however, as the time within which the wrong was to be undone has expired, we remand this case with directions to the court of common pleas of Cape Girardeau to re-enter its decree as heretofore entered, but fixing the time within which the acts commanded are to be done within sixty days from the date of the rendition of the amended decree. This also lodges the enforcement of the decree within the power of that court. Costs of the cause and of the appeal are adjudged against the appellants. *Nortoni, J.,* concurs, *Caulfield, J.,* in the result.

